NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13804

JEREMIAH NICHOLLS & others[1]  vs.  VEOLIA WATER CONTRACT
OPERATIONS USA, INC.[2]


Suffolk.    March 4, 2026. - July 13, 2026.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, Georges,
Dewar, & Wolohojian, JJ.


Labor, Wages, Public works.  Public Works, Wage determination.
    Statute, Construction.  Words, "Improvements."



    Certification of questions of law to the Supreme Judicial
Court by the United States Court of Appeals for the First
Circuit.


    Terence E. Coles for the plaintiffs.
    Barry J. Miller (Adrienne C. Lee also present) for the
defendant.
    David B. Wilson & Charlotte M. Petilla, for Springfield
water and sewer commission, amicus curiae, submitted a brief.


    WENDLANDT, J.  In this case, we answer the following

certified questions regarding St. 1997, c. 155 (special act),

_____

    [1] Walter Goodrow, Wesley Dinsmore, and Richard Ruppert.

    [2] Formerly known as Suez Water Environmental Services, Inc.

and the Prevailing Wage Act, G. L. c. 149, §§ 26-27H (PWA):[3]

> "1. What is meant by the phrase 'construction and design of improvements' as used in [§] 6 of [the special act]?

> "2. Is [the special act] incompatible with the [PWA] under the court's decision in Metcalf v. BSC Group, Inc., [492 Mass. 676 (2023)]?"

In response to the first question, we conclude, with reference to the parties' arguments before this court, that the phrase "construction and design of improvements" in § 6 of the special act is not synonymous with "construction" as defined in the PWA, G. L. c. 149, § 27D; moreover, the phrase does not encompass ordinary repairs, routine inspections, day-to-day operations and maintenance, or ordinary replacements.

Regarding the second question, we answer "no." In Metcalf, we addressed professional services contracts untethered to any particular public works project and governed by G. L. c. 7C, § 58. The special act concerns the Springfield water and sewer commission's wastewater treatment facility, sewers, and pump

---

[3] A panel of the United States Court of Appeals for the First Circuit (certifying court) certified the questions pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981), which provides in relevant part:

> "This court may answer questions of law certified to it by . . . a Court of Appeals of the United States . . . when requested by the certifying court if there are involved in any proceeding before it questions of law of this State which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of this court."

stations; unlike G. L. c. 7C, § 58, the special act expressly provides that certain work -- namely, work that falls within "construction and design of improvements" -- is governed by the PWA. The decision in Metcalf does not control the provisions of the special act or its compatibility or incompatibility with the PWA.[4]

1. Background. a. Statutory framework. Because the certified questions require us to consider the special act, we begin by briefly reviewing its history and relevant provisions.

In 1996, the city of Springfield (city) formed the Springfield water and sewer commission (commission) to oversee and to maintain drinking and wastewater systems; the commission owns and operates the city's regional wastewater treatment facility and associated sewage collection, pumping, and interceptor systems.[5] See G. L. c. 40N, § 4 (water and sewer

---

[4] We acknowledge the amicus brief submitted by the Springfield water and sewer commission.

[5] The city elected to form the commission pursuant to G. L. c. 40N, which permits local governments to establish municipal water and sewer commissions with enumerated powers. See G. L. c. 40N, § 4 (discussing creation of water and sewer commissions and membership processes); G. L. c. 40N, §§ 8, 9 (discussing powers and limitations of water and sewer commissions). The commission has authority to set fees and rates for water and sewage services, to regulate water sources, and to protect and improve water and sewage systems for the city and surrounding communities. G. L. c. 40N, § 9 (a) (authorizing and empowering commissions to "fix, revise, charge, collect and abate fees, rates, rents, assessments, delinquency charges and other charges for water, sewer and other services"); G. L. c. 40N, § 8 (i)

commissions are independent public instrumentalities), § 6 (commissions shall "own, control, operate and maintain the water works system and the sewer works system").

That same year, following the lead of other communities in the Commonwealth, the commission decided to privatize its wastewater operations; it sought to enter into a long-term contractual relationship with a qualified entity to upgrade its main wastewater treatment facility and associated systems and thereafter to manage the operation and maintenance of wastewater services for the commission. With assistance from the office of the Inspector General, which had expressed concerns regarding other communities' privatization efforts, the commission sought special act legislation[6] exempting it from many of the laws applicable to the procurement and awarding of public contracts.

In 1997, the Legislature passed the special act, which permits the commission to outsource the operation of its wastewater facilities and exempts it from compliance with some

---

(granting water and sewer commissions power to "construct, improve, extend, enlarge, maintain and repair the water works system and the sewer works system").

[6] Special acts are "legislation addressed to a particular situation . . . that [do] not establish a rule of future conduct with any substantial degree of generality, and [which] may provide ad hoc benefits of some kind for an individual or a number of them" (citation omitted). Pearson v. Sheriff of Bristol County, 489 Mass. 691, 694 n.9 (2022). These acts are not codified in the General Laws but have the "same force and effect as a General Law" (citation omitted). Id.

generally applicable public works statutes.  See St. 1997,

c. 155.  The special act authorizes the commission to enter into

contracts

> "for the sale or lease, operation and maintenance,
> financing, design and construction of modifications and
> installation of new equipment and systems necessary at the
> wastewater treatment facility, sewers and pump stations to
> ensure adequate services and to ensure the ability of said
> commission's wastewater treatment facility, sewers and pump
> stations to operate in full compliance with all applicable
> requirements of federal, state and local law."

St. 1997, c. 155, § 1.  Such contracts "shall not be subject to

the competitive bid requirements" in G. L. c. 30, § 39M, or

G. L. c. 149, §§ 44A to 44J.[7]  Id.

Contracts entered into pursuant to the special act may

provide for terms of up to twenty years, with an option for

renewal or extension of operations and maintenance services for

one additional term of up to five years.  St. 1997, c. 155, § 2.

Contracts may provide for, inter alia, "equipment installation

and replacement, performance testing and operation, studies,

design and engineering work, construction work, [and] ordinary

repairs and maintenance . . . required for the wastewater

treatment facility, sewers and pumping stations and the

management, operation, maintenance and repair" of the same.  Id.

The special act provides detailed procedures for the

---

[7] Additional statutes from which the commission is exempt
pursuant to St. 1997, c. 155, § 1, have been repealed.  See
G. L. c. 7, §§ 38A1/2-38O, repealed by St. 2012, c. 165, § 66.

solicitation and evaluation of proposals.  St. 1997, c. 155,

§§ 3-4.  After reviewing submissions, the commission must make a

preliminary determination of the "most advantageous proposal

from a responsible and responsive offeror[,] taking into

consideration price, estimated life-cycle costs and the other

evaluation criteria set forth in the request for proposals"

issued by the commission.  St. 1997, c. 155, § 4.  Thereafter,

the commission may negotiate with the top two offerors and award

the contract to the offeror with the most advantageous proposal.

Id.  Section 6 of the special act provides, in relevant part:

> "The provisions of any general or special law or regulation
> relating to the advertising, bidding or award of contracts,
> to the procurement of services or to the construction and
> design of improvements, except the provisions of [the PWA],
> shall not be applicable to any selected offeror which is
> awarded a contract pursuant to this act, except as provided
> in this section."

St. 1997, c. 155, § 6.

b.  Facts.  Since the enactment of the special act, the

commission has executed two twenty-year operation-maintenance-

construction contracts, one in 2000 and, relevant here, another

in 2020.

Ahead of the 2020 contract, in July 2019, the commission

issued a request for proposals for wastewater services, which

included a proposed service contract covering its main

wastewater treatment facility and the associated sewage

collection, pumping, and interceptor systems.  The request

included the prevailing wage rates issued by the Department of Labor Standards pursuant to the PWA. Offerors were instructed that this prevailing wage schedule was required for "[d]esign and [b]uilding improvements to [the] wastewater treatment plant including: upgrades to main electrical system, ventilation system, aeration systems, and septage receiving facility."

The commission selected and contracted with Veolia Water Contract Operations USA, Inc. (Veolia), to perform these upgrades as well as operations, maintenance, repair, and replacement work on its wastewater treatment facility and systems.[8] The service contract provided for two distinct stages of work. The first stage consisted of initial capital improvements -- specific structural improvements intended to upgrade the commission's main wastewater treatment facility. The contract provided that work performed at the initial capital improvements stage was subject to the prevailing wage requirements of the PWA. None of Veolia's employees performed this work; Veolia subcontracted the initial capital improvements work to other entities.

The second stage consisted of ongoing operation, maintenance, repair, and replacement services for the

---

[8] The contract was awarded to Suez Water Environmental Services, Inc., Veolia's predecessor in interest; nothing in the record suggests that this corporate change affects our analysis as it pertains to the certified questions.

commission's wastewater facilities and equipment.  Work performed under this stage of the contract was paid according to the rates set forth by collective bargaining agreements between Veolia and employee unions.  The plaintiffs, Jeremiah Nicholls, Walter Goodrow, Wesley Dinsmore, and Richard Ruppert (employees), are Veolia employees who performed "operations, maintenance, repair, and replacement work" encompassed by this stage of the contract.[9]

c.  Prior proceedings.  The employees filed a complaint in the Superior Court pursuant to G. L. c. 149, § 27, alleging that they are entitled to prevailing wages for the work they perform.  Veolia removed the matter to Federal District Court, and after a period of discovery, the parties filed cross motions for summary judgment.  Concluding that the employees' work did not fall within "construction and design of improvements" under the

---

[9] The parties appear to dispute the scope of the employees' day-to-day work.  The employees describe their work as including "rebuilding wastewater pumps, installing pipes and pumps, installing and fixing electrical components that include wire, boxes and lights, . . . fixing and repairing broken sidewalks and buildings, concrete, metal and wood, repairing broken metal and PVC lines, deragging and repairing clogged pumps and pipes, installing and repairing dewatering pumps and concrete work demolition and repair and new installation."  Veolia contends that the employees' work comprised tasks delineated in the service contract, including "Ordinary Maintenance," "Inspections, Cleaning, and Blockage and Build-Up Removal," and "Repair and Maintenance of Grounds."  These disparate descriptions do not affect our answers to the certified questions.

special act, the Federal District Court judge entered judgment in favor of Veolia.  On appeal, the United States Court of Appeals for the First Circuit issued an order certifying the two questions now before this court.  Nicholls v. Veolia Water Contr. Operations USA, Inc., 144 F.4th 354, 359 (1st Cir. 2025).

2.  Discussion.  a.  Statutory construction.  The first certified question -- "What is meant by the phrase 'construction and design of improvements' as used in [§] 6 of [the special act]?" -- presents a legal issue of statutory construction.  See Conservation Comm'n of Norton v. Pesa, 488 Mass. 325, 331 (2021).

Statutes are interpreted "'according to the intent of the Legislature,' which we derive 'from all [of the statute's] words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished.'"  Hartnett v. Contributory Retirement Appeal Bd., 494 Mass. 612, 616 (2024), quoting Matter of the Estate of Mason, 493 Mass. 148, 151 (2023).  "In construing a statute, 'our analysis begins with the principal source of insight into legislative intent -- the plain language of the statute.'"  Gravito v. Commonwealth, 496 Mass. 756, 759 (2025), quoting Patel v. 7-Eleven, Inc., 489 Mass. 356, 362 (2022), S.C., 494 Mass. 562 (2024).  "If the statutory language is clear and

unambiguous, it is conclusive as to legislative intent" (quotation and citation omitted). Gravito, supra. We construe statutes in view of "the statutory scheme as a whole . . . so as to produce an internal consistency within the statute" (citation omitted). Matter of the Estate of Mason, supra at 152. These same principles guide our construction of special acts. See Chin v. Merriot, 470 Mass. 527, 532 (2015).

b. "Construction and design of improvements." Section 6 of the special act provides that "[t]he provisions of any general or special law or regulation relating . . . to the construction and design of improvements, except the provisions of [the PWA], shall not be applicable to any selected offeror which is awarded a contract pursuant to [the special] act." St. 1997, c. 155, § 6. The parties agree that the special act exempts wastewater facility services provided under such contracts from most public works laws but provides that the PWA continues to govern work comprising the "construction and design of improvements."[10]

---

[10] Applying the last antecedent rule, the Federal District Court judge concluded, contrary to the employees' arguments before that court, that the PWA applies only to "the construction and design of improvements," a conclusion "consistent with the overall purpose of the [s]pecial [a]ct." See generally Commonwealth v. Marquis, 495 Mass. 434, 443 (2025), cert. denied, 146 S. Ct. 1445 (2026), quoting Black's Law Dictionary 1602 (12th ed. 2024) ("according to [the last antecedent rule,] 'a court determines that qualifying words or phrases modify the words or phrases immediately preceding them

The employees argue that "construction and design of improvements" has the same meaning as the term "construction" in the PWA.  The PWA defines "construction" to include

> "additions to and alterations of public works, the installation of resilient flooring in, and the painting of, public buildings and public works; certain work done preliminary to the construction of public works, namely, soil explorations, test borings and demolition of structures incidental to site clearance and right of way clearance; and the demolition of any building or other structure ordered by a public authority for the preservation of public health or public safety" (emphasis added).

G. L. c. 149, § 27D.  Notably, we have previously determined that the PWA's definition of "construction" is broad and, as such, plausibly encompasses repair work.  See Felix A. Marino Co. v. Commissioner of Labor & Indus., 426 Mass. 458, 461 (1998) (noting that "the Legislature has not taken a narrow view of

and not words or phrases more remote, unless the extension is necessary from the context or the spirit of the entire writing'"), and citing A. Scalia & B.A. Garner, Reading Law: The Interpretation of Legal Texts 152-153 (2012).

Before the First Circuit, the employees did not challenge the judge's conclusion; instead, as the First Circuit expressly noted, "[t]he parties [did] not argue . . . that [§] 6 of the [s]pecial [a]ct should be read to apply the PWA to any endeavor other than 'the construction and design of improvements.'" Nicholls, 144 F.4th at 358.  Nor do the employees raise before this court any challenge to the scope of the applicability of the PWA beyond the "construction and design of improvements." Accordingly, we confine our analysis to the certified questions, assuming without deciding that the PWA applies only to the "construction and design of improvements."  See Silva v. Rent-A-Center, Inc. 454 Mass. 667, 669 n.3 (2009), and cases cited (declining to address claims and arguments "tangential to the certified question").

additions and alterations" and concluding that interpretation of "construction" by Commissioner of Labor and Industries as encompassing pavement repair work fell "[with]in the exercise of [the Commissioner's] authority").

It is "[a] general principle of statutory interpretation . . . that every word should be imbued with meaning and no word is considered superfluous" (quotations and citation omitted). Matter of J.P., 494 Mass. 654, 668 (2024).  See DiMasi v. Secretary of the Commonwealth, 491 Mass. 186, 194 (2023), quoting Pesa, 488 Mass. at 331 ("We must presume that the Legislature intended what the words of the statute say, and where the language is clear, it is 'conclusive as to legislative intent'").  Here, the special act does not reference "construction" in isolation; instead, the Legislature provided that "the construction and design of improvements" would be governed by the PWA.  Thus, according to the statutory language, the only "construction" to be governed by the PWA is the "construction" "of improvements."[11]  See note 10, supra.

---

[11] That the phrase "of improvements" modifies both "construction" and "design" in the phrase "the construction and design of improvements" is apparent from its context -- specifically, the entire phrase "[t]he provisions of any general or special law or regulation relating . . . to the construction and design of improvements."  St. 1997, c. 155, § 6.  The phrase "[t]he provisions of any general or special law or regulation relating . . . to the construction" on its own would be nonsensical; to make sense, the prepositional phrase "of improvements" must modify "construction."

Acknowledging this conclusion, the employees offer a construction of "improvements," to which we now turn.

Relying on a dictionary definition of the term "improves" (rather than "improvements"), the employees contend that "improvements" means any work that "improves or enhances" the wastewater treatment facility. Because "construction" under the PWA includes repair work and because repair work "improves" the structure repaired, the employees contend that the term "construction and design of improvements" is synonymous with "construction" as defined by the PWA. We disagree.

When interpreting a term in a statute that, in context, refers to the term's technical meaning, that specialized definition -- rather than the term's ordinary meaning -- applies. See G. L. c. 4, § 6, Third ("technical words and phrases and such others as may have acquired a peculiar and appropriate meaning in law shall be construed and understood according to such meaning"); Lockwood v. Adamson, 409 Mass. 325, 332 (1991) ("We ascribe to technical, legal terms in statutes their technical meaning"). Here, it is clear from the context of the special act that it employs the technical meaning of "improvements" as it pertains to property.

In particular, the term "improvements," in the context of property like the wastewater facilities at issue, has a specialized definition that does not encompass ordinary repairs,

routine inspections, day-to-day operations and maintenance, or ordinary replacements.  See Black's Law Dictionary 757 (6th ed. 1990) (defining "improvement" as "[a] valuable addition made to property [usually real estate] or an amelioration in its condition, <u>amounting to more than mere repairs or replacement</u>, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes" [emphasis added]); Black's Law Dictionary 904 (12th ed. 2024) (defining "improvement" as "[a]n addition to property, [usually] real estate, whether permanent or not; [especially], one that increases its value or utility or that enhances its appearance").[12]  See also <u>Conley</u> v. <u>Scott Prods., Inc</u>., 401 Mass. 645, 647 (1988), quoting Webster's Third New International Dictionary 1138 (1961) (interpreting phrase "improvement to real property" as used in G. L. c. 260, § 2B, to mean "a permanent

---

[12] By contrast, maintenance generally includes ordinary repairs and routine replacements.  See Black's Law Dictionary 953 (6th ed. 1990) (defining "maintenance" as "[t]he upkeep or preservation of condition of property, including cost of ordinary repairs necessary and proper from time to time for that purpose"); <u>id</u>. at 1298 (defining "repair" as "contemplat[ing] an existing structure or thing which has become imperfect, and . . . thereby restor[ing] it to the condition in which it originally existed, as near as may be"); Black's Law Dictionary 1139 (12th ed. 2024) (defining "maintenance" as "[t]he care and work put into property to keep it operating and productive; general repair and upkeep"); <u>id</u>. at 1556 (defining "repair" as "[t]o restore to a sound or good condition after decay, waste, injury, or partial destruction, dilapidation, etc.; to fix").

addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs" [emphasis added]); Milligan v. Tibbetts Eng'g Corp., 391 Mass. 364, 368 (1984) (same).

Examination of the whole phrase "construction and design of improvements" confirms the specialized use of the term "improvements"; it suggests that the envisioned "improvements" also may involve design work, which generally is not required for ordinary repairs, routine inspections, day-to-day operations and maintenance, or ordinary replacements.[13] See note 12, supra.

Other provisions of the special act bolster this construction. In particular, the special act repeatedly

---

[13] Notably, the special act requires that a qualified wastewater engineer be involved in the assessment and completion of improvements, a safeguard incorporated into the special act based on the office of the Inspector General's guidance to the commission that further confirms the specialized use of the term "improvements." See St. 1997, c. 155, § 6 (requiring that qualified wastewater engineer "independently assess the need for [any proposed] capital improvement, renovation, modernization, installation or replacement work" and authorizing the commission to "approve, modify, or reject" proposals based on said engineer's recommendation [emphasis added]). See also Office of the Inspector General, Annual Report 1996, at 7 (Dec. 1997) ("The Office [of the Inspector General] advised the [c]ommission to incorporate provisions to strengthen the [c]ommission's control over the quality and cost of plant improvements planned, designed, and built by the private operator").

distinguishes "design" and "construction" work, on the one hand, from "operations," "maintenance," and "ordinary repairs," on the other.  See, e.g., St. 1997, c. 155, § 1 (commission may enter into contracts for "the sale or lease, operation and maintenance, financing, design and construction of modifications and installation of new equipment and systems" [emphases added]), § 2 (discussing costs to "finance, permit, design and construct modifications or install new equipment and systems" and payment obligations "for all operations and maintenance services"; contracts entered into pursuant to special act "may provide for [various activities, including] equipment installation and replacement, . . . construction work, ordinary repairs and maintenance . . . and the management, operation, maintenance and repair of [the] commission's wastewater treatment facility, sewer and related pumping stations" [emphases added]), § 6 (referencing "the initial contract for the lease or sale, operation and maintenance, design and construction of the wastewater treatment facility, sewers and pump stations" [emphases added]).

The Legislature's use of these different terms confirms that it did not intend "construction and design of improvements" in § 6 to encompass ordinary repairs, routine inspections, day-to-day operations and maintenance, or ordinary replacements. See Commonwealth v. Fleury, 489 Mass. 421, 427 (2022) ("[a]

fundamental and long-standing principle of statutory interpretation [holds] that we must strive to give effect to each word of a statute so that no part will be inoperative or superfluous" [quotation and citation omitted]); Hallett v. Contributory Retirement Appeal Bd., 431 Mass. 66, 69 (2000) ("All words, clauses, and parts of a legislative enactment should be given force and effect and no part is to be brushed aside unless no other rational course is open.  Where words in a statute are used in one part of a statute in a definite sense, they should be given the same meaning in another part of the statute" [citation omitted]).

Indeed, reading ordinary repairs, routine inspections, day-to-day operations and maintenance, and ordinary replacements into the phrase "construction and design of improvements" would appear to run counter to the Legislature's stated intent in enacting the special act -- to permit the commission to enter into long-term contracts for the operation of wastewater services (including services like ordinary repairs and maintenance) without compliance with ordinary bidding procedures for public works projects.  See St. 1997, c. 155, § 1 (setting forth purpose of special act to exempt commission from compliance with competitive bid laws generally applicable to public works).  Accordingly, we conclude that the phrase "construction and design of improvements" does not encompass

ordinary repairs, routine inspections, day-to-day operations and maintenance, or ordinary replacements.

c.  Relationship to Metcalf.  The second question asks whether the special act is incompatible with the PWA under this court's decision in Metcalf, 492 Mass. 676.  In Metcalf, we considered whether contracts for professional services, which were "untethered to a particular public works construction project" and awarded based on the offeror's "qualifications to provide expert professional consulting services" to a government agency over the course of years consistent with G. L. c. 7C, § 58, were governed by the PWA.  Id. at 677.  We concluded that the professional services contracts were not governed by the PWA.  Id.

The special act, as described supra, concerns the commission's wastewater treatment facility, sewers, and pump stations; it expressly permits the commission to enter into long-term contracts for, inter alia, the privatization of much of the wastewater services provided to the city and the neighboring region.  Work that falls within the "construction and design of improvements" is governed by the PWA.  While aspects of our analysis in Metcalf may overlap with our discussion supra, Metcalf does not control the application of the special act or its compatibility or incompatibility with the PWA.

3.  Conclusion.  We respond to the certified questions as follows.

First, the phrase "construction and design of improvements" in the special act is not synonymous with the use of "construction" in the PWA; moreover, the phrase does not encompass ordinary repairs, routine inspections, day-to-day operations and maintenance, or ordinary replacements.  Second, the decision in Metcalf concerned professional services contracts untethered to any particular public works project and governed by G. L. c. 7C, § 58; Metcalf does not control the provisions of the special act or its compatibility or incompatibility with the PWA.

The Reporter of Decisions is directed to furnish attested copies of this opinion to the clerk of this court.  The clerk in turn will transmit one copy, under the seal of the court, to the clerk of the United States Court of Appeals for the First Circuit, as the answer to the questions certified, and will also transmit a copy to each party.